UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

CYNTHIA EMANUELE,

            Plaintiff,

        v.                                        Case No. 09-C-0485

MICHAEL J. ASTRUE,

            Defendant.

DECISION AND ORDER REVERSING DECISION OF
AND REMANDING CASE TO THE COMMISSIONER

        Plaintiff, Cynthia Emanuele, filed a claim for Disability Insurance Benefits

(DIB) on June 24, 2004, claiming disability as of June 4, 2004. It is undisputed that in the

spring or early summer of 2004 she was diagnosed with multiple sclerosis.

        Emanuele's application was denied initially and on reconsideration. She

requested an administrative hearing, which was conducted on November 15, 2006. (Tr.

414-58.[1]) She appeared with counsel and testified at the administrative hearing, as did her

daughter, Stephanie, and a vocational expert (VE), Michele Albers. December 19, 2006,

the administrative law judge (ALJ) concluded that Emanuele was not disabled within the

meaning of the Social Security Act because she could perform a significant number of light

jobs. (Tr. 250-57.) The Appeals Counsel granted Emanuele's request for review on July

16, 2007, and remanded the case to the ALJ for further proceedings. (Tr. 258-61.) Among

other matters, the ALJ was directed to address Exhibit 12F, a medical source statement

_____

[1]"Tr." refers to the administrative transcript filed on December 28, 2009, at docket 12.

from Dr. Bhupendra Khatri indicating that Emanuele meets section 11.09A of the Commissioner's "listings." (Tr. 259.)

On June 11, 2008, the ALJ held a second hearing, at which Emanuele and her husband testified. (Tr. 459-515.) Again, Emanuele was represented by counsel. The ALJ then referred Emanuele for psychological testing. (*See* Tr. 511-12.) As a result, Emanuele saw Dr. Frank Elmudesi on July 7, 2008. (Tr. 335-44 (Ex. 14F).)

The ALJ convened a third hearing on October 28, 2008, at which Emanuele appeared with counsel and testimony was given by medical expert Dr. Larry Larrabee, and VE Albers. (Tr. 516-75.) Dr. Elmudesi's report was also provided to the ALJ. On November 24, 2008, the ALJ issued his decision finding Emanuele disabled, but only as of July 7, 2008, the date on which she saw Dr. Elmudesi. The ALJ found Emanuele not disabled from her alleged onset date of June 4, 2004, to July 7, 2008. (Tr. 17-27.) Review was denied by the Appeals Council on March 9, 2009, making the ALJ's determination the final decision of the Commissioner. (Tr. 7.)

In this appeal from the Commissioner's decision Emanuele seeks judicial review on the denial of benefits for the period June 4, 2004, to July 7, 2008.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and is based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, when supported by substantial evidence, are conclusive. § 405(g). Substantial evidence is relevant evidence that a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). This court cannot

reweigh evidence or substitute its judgment for that of the ALJ. *Binion ex rel. Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, if the ALJ commits an error of law reversal is required without regard to the volume of evidence supporting the factual findings. *Id.* Failure to follow the Commissioner's regulations and rulings constitutes legal error. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

An ALJ must "'minimally articulate his reasons for crediting or rejecting evidence of disability,'" *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he or she cannot select and discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Evidence favoring as well as disfavoring the claimant must be examined by the ALJ, and the ALJ's decision should reflect that examination. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ's decision lacks evidentiary support or is "so poorly articulated as to prevent meaningful review," the district court should remand the case. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (internal quotation marks omitted). However, a "sketchy opinion" may be sufficient if it is clear the ALJ considered the important evidence and the ALJ's reasoning can be traced. *Id.* at 787.

To obtain DIB, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.

The Administration has adopted a sequential five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The ALJ must determine at step one whether the claimant is currently engaged in substantial gainful activity. If so, she is not disabled. If not, at step two the ALJ must determine whether the claimant has a severe physical or mental impairment. If not, the claimant is not disabled. If so, at step three the ALJ determines whether the claimant's impairments meet or equal one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"), as being so severe as to preclude substantial gainful activity. If so, the claimant is found disabled. If not, at step four the ALJ determines the claimant's residual functional capacity (RFC) and whether the claimant can perform her past relevant work. If she can perform her past relevant work she is not disabled. However, if she cannot perform past work, then at step five the ALJ determines whether the claimant has the RFC, in conjunction with age, education, and work experience, to make the adjustment to other work. If the claimant can make the adjustment, she is found not disabled. If she cannot make the adjustment, she is found disabled. 20 C.F.R. 404.1520; *see Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

RFC is the most the claimant can do in a work setting despite her limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p; *Young*, 362 F.3d at 1000-01. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. § 404.1545(a)(2), (e).

The burden of moving forward at the first four steps is on the claimant. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can

4

successfully perform a significant number of other jobs that exist in the national economy. *See Young*, 362 F.3d at 1000.

## ALJ'S FIVE-STEP ANALYSIS

At step one the ALJ found that Emanuele had not engaged in substantial gainful activity since the alleged onset date of June 4, 2004. (Tr. 19.) At step two he found that since the alleged onset date Emanuele had suffered from the severe impairments of multiple sclerosis and cognitive disorder not otherwise specified. (*Id.*) Next, at step three, he found that Emanuele's impairments did not meet or medically equal a listed impairment.

In determining RFC at step four, the ALJ found that prior to July 7, 2008, Emanuele was able to lift twenty pounds occasionally and ten pounds frequently, was able to sit for six hours of an eight-hour day, could stand for six hours of an eight-hour day, and was available only for simple, routine, and repetitive work. He determined that she had the RFC to perform light work. (Tr. 21.) However, the ALJ found that beginning on July 7, 2008, (although Emanuele still had the RFC to perform light work with the same abilities to lift, stand, and sit, and the same restriction to simple, routine, and repetitive work) she had a "mildly limited ability for fingering and other fine manipulation tasks." The ALJ further determined that Emanuele "would be randomly absent from work 3 or more days per month" due to psychological reasons. (Tr. 24.)

With this RFC determination, the ALJ then found that prior to July 7, 2008, Emanuele could have performed her past relevant work as a waitress and that there were a significant number of jobs in the national economy that she could have performed, such as food preparation worker (12,000 jobs), small products assembly (12,500 jobs), and janitor (5,000 jobs). Therefore, Emanuele lost at step four and step five.

5

According to the ALJ, beginning on July 7, 2008, there were no jobs in the national economy that Emanuele could perform. Therefore, he found her disabled as of that date.

## DISCUSSION

Emanuele challenges the denial of benefits from June 4, 2004, to July 7, 2008. She labels five errors by the ALJ on appeal. However, because she proceeds pro se in this proceeding, her filings are entitled to a liberal construction. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972).

The court has found subparts in alleged error number 2 and therefore interprets Emanuele's brief as arguing the following errors by the ALJ: (1) improper consideration of the opinions of treating physician Dr. Bhupendra Khatri; (2) (a) failure to develop the record regarding an "evoked response test," (b) improper weight given to the opinion of Dr. Robert Braco, (c) incorrect consideration of the listings, and (d) incorrect consideration of Emanuele's pain; (3) improper consideration of a statement in the records from Dr. Judith Carlson that Emanuele "was evasive and resistant to answering" and a possible credibility issue; (4) failure to find that Emanuele's cognitive issues existed prior to July 7, 2008; and (5) mischaracterization of evidence.

*(1)    Records and Opinion of Treating Physician Dr. Khatri*

First, Emanuele contends that the ALJ erred when he chose to give little weight to an opinion of Dr. Bhupendra Khatri, including the opinion in Exhibit 12F. (*See* Pl.'s Br. 6-7.) Doctor's opinions, including those of Dr. Khatri, were addressed in the ALJ's determination of RFC before determinations at steps four and five.

Generally, the Administration gives more weight to the medical opinion of a source who examined the claimant than the opinion of a source who did not. 20 C.F.R. § 404.1527(d)(1). Because of the unique perspective of and longitudinal picture from a treating physician, his or her opinion is given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *accord* SSR 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "Controlling weight" means that the opinion is adopted. SSR 96-2p. A treating physician's opinion may have several points; some may be given controlling weight while others may not. *Id.* An "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470.

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight "does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p. In determining the weight to give a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the physician's evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialty of the physician, and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator

gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel*, 345 F.3d at 470.

Generally, more weight is given to the opinion of a specialist regarding issues related to the area of specialty than to the opinion of a source who is not a specialist. § 404.1527(d)(5). The weight given to nonexamining sources "will depend on the degree to which they provide supporting explanations for their opinions" and "the degree to which these opinions consider all of the pertinent evidence." 20 C.F.R. § 404.1527(d)(3). If an ALJ asks for opinions of medical experts, those opinions are considered using these same rules. § 404.1527(f)(2)(iii).

The decision whether a claimant is disabled is reserved for the Commissioner. A statement by a medical source that a claimant is unable to work does not mean that the Commissioner will determine the claimant to be disabled. § 404.1527(e).

Dr. Khatri was Emanuele's treating physician in a neurology clinic from July 2004, until at least November 2006, as a result of a referral by Dr. David Theis. (Tr. 227-36, 245-46.) His reports on Emanuele noted "[s]ignificant disability secondary to MS" and "[r]elapsing-remitting MS" in July 2005 (Tr. 235), and "[s]ignificant disability secondary to multiple sclerosis," "[m]emory issues which will be further re-evaluated," and "easy fatigabilty" in May 2006. (Tr. 231). Dr. Khatri's physical examinations revealed that Emanuele could not walk on her toes and heels and "could not do tandem gait." (Tr. 231, 233, 235.) Her Romberg tests at times came back positive, moderately positive, and

negative.[2]  (Tr. 231, 233, 235.)  Also, Dr. Khatri gave Emanuele a prescription for a scooter.  (Tr. 184.)

Exhibit 12 F, a two-page questionnaire that Dr. Khatri filled out, included his finding that Emanuele suffers from "significant and persistent disorganization of motor function" in at least two extremities, which results in "sustained disturbance of gross and dexterous movement, gait and station."  (Tr. 245.)  Dr. Khatri opined that Emanuele suffered fatigue of motor function and weakness on repetitive activity and that the weakness resulted from neurological dysfunction.  (Tr. 245-46.)

The ALJ referenced several medical records from Dr. Khatri regarding notations respecting improvement or stability of Emanuele's condition and Emanuele refusing usual treatment options for her MS.  (Tr. 22-23.)  He noted records indicating she was ambulating without difficulty and her tandem walking was essentially normal.  (Tr. 22.)  However, the ALJ did not address the portions of Dr. Khatri's medical records from 2005 and 2006 discussed above, which referenced positive Romberg testing, memory issues, fatigue, and difficulty walking.  Further, the ALJ considered the questionnaire only as follows:

> The opinion of Dr. Khatri in Exhibit 12F is also given little consideration because he completed a brief non-SSA form regarding the claimant's multiple sclerosis, but did not indicate any specific functional limitations she had in regards to work. Furthermore, he did not indicate that the claimant was disabled or could not work.  The form is comprised of independently created interpretations of the Social Security

[2]A Romberg sign occurs "when a patient, standing with feet approximated, becomes unsteady or much more unsteady with eyes closed."  Stedman's Medical Dictionary 1771 (28th ed. 2006). Therefore, it appears that a positive test result would indicate that Emanuele has balance problems with her eyes closed.

> listings, and does not include information useful in establishing
> a residual functional capacity for the claimant.

(Tr. 24.)  In no way did the ALJ otherwise discuss the weight given to Dr. Khatri's records or opinions.

The ALJ did not address the treating physician standard regarding Dr. Khatri's opinions and the questionnaire.  He failed to sufficiently discuss why the questionnaire opinion of this treating physician—a specialist in neurology—was not given controlling weight.  Nor did he indicate whether consideration was given to the length of the treatment relationship between doctor and patient, how many times Dr. Khatri saw Emanuele, or that Emanuele had Dr. Khatri specifically for MS treatment.  *See* 404.1527(d).  Although the ALJ said he considered all opinion evidence in accord with 20 C.F.R. § 404.1527 and SSR 96-2p, his decision does not walk through any analysis of controlling weight for treating physicians's opinions or the weight given a noncontrolling opinion, in blatant disregard of the applicable standards.

As for Dr. Khatri's two-page questionnaire, the ALJ's explanation that the form was not an Administration form puts form before substance; what the doctor states is important, not the particular form used.  The ALJ's explanations that Dr. Khatri did not indicate specific functional limitations regarding Emanuele's capacity to work (presumably regarding her ability to sit, stand, or lift objects) and failed to indicate that she was disabled or could not work also are insufficient.  That Dr. Khatri did not provide further details does not mean that his finding that Emanuele suffered "significant and persistent disorganization of motor function" in at least two extremities, resulting in "sustained disturbance of gross and dexterous movement, gait and station" should be ignored.  Further, whether Emanuele

10

is disabled or could not work is for the ALJ to determine; Dr. Khatri could only be expected to opine on Emanuele's condition, not on whether her condition made her disabled for purposes of DIB.

Moreover, the ALJ failed to refer to the other records, which, as discussed above, show that Emanuele was easily fatigued, had problems walking, at times was swaying, was prescribed a scooter, and had memory issues by May 2006. He neglected to discuss why these findings were not given controlling weight or, if not, what weight they were given as noncontrolling treating physician opinions. Instead, the ALJ set out only the findings that supported his conclusion—mainly, that some of Dr. Khatri's records noted improvement or stabilizing of Emanuele's condition and that she had rejected his counsel regarding treatment options.

For these reasons, the case will be remanded to the ALJ for reconsideration of all of Dr. Khatri's records and opinions.

*(2)(a)  Development of the Record through an Evoked Response Test*

Next, Emanuele contends that the ALJ failed to develop the record properly because he did not direct completion of an "evoked response test." Nothing in the evidence of record explains what this test is, though the Commissioner's brief indicates that the test is one for determining whether a person suffers from MS.

Emanuele has failed to persuade the court that an evoked response test is even relevant to her medical case—that it would add anything at this point regarding determining her RFC. If somehow an evoked response test would be relevant on remand, she can make that argument before the ALJ.

*(2)(b)  Improper Weight Given to the Opinion of Dr. Robert Braco*

Emanuele saw Dr. Robert Braco for a consultative exam on October 14, 2004.  (Tr. 156-60.)  The ALJ discussed Dr. Braco's report as follows:

> The claimant reported that she was feeling better in several ways.  She reported taking primarily over-the-counter medications, and not following up with her interferon injections. . . . She was noted to be steady and not shaky.  Her upper and lower body strength was 5/5, with no giving way.  Straight leg raising was 85 degrees symmetrically.  She could feel all her fingers and toes during the examination.  Sensation was intact, and the vibration test was normal, as were her reflexes.  She walked at a good pace without physical support.  She was able to walk on her toes.  She climbed 18 stairs taking only about a minute longer than average.  She reported being able to do at least some cooking, cleaning, and shopping.  She held a regular driver's license with no limitations on it.  She reported taking over-the-counter supplements.  The doctor confirmed her recent diagnosis of multiple sclerosis.  He did not recommend any specific work restrictions, nor did he state that he believed she could not work (Exhibit 3F).

(Tr. 22.)  The ALJ then stated, with no follow-up discussion, that he was giving Dr. Braco's opinion "significant weight."  (Tr. 24.)

Emanuele points out that Dr. Braco's examination did not address her complaints of pain and fatigue, was conducted during a period of remission rather than exacerbation, and did not consider the frequency or duration of exacerbations.

In stating that he was giving Dr. Braco's report "significant weight" the ALJ failed to mention the criteria set forth in § 404.1527, including how often Dr. Braco had seen Emanuele, and whether he had seen her during a period of remission.  The ALJ did not address that Dr. Braco saw Emanuele just once.  Further, a review of Dr. Braco's report indicates that the ALJ did not balance the evidence supporting his conclusion with the evidence contrary to his decision.  For instance, the ALJ stated that Emanuele reported to

Dr. Braco that she was feeling better in several ways. That statement in Dr. Braco's report was immediately followed by notation of a "couple of things that are worse compared to June such as her energy level" and that she sometimes needs to nap just a few hours after waking in the morning. Dr. Braco also observed that Emanuele reported that her fatigue "still occurs several times a day." (Tr. 156.) Consequently, this case must be remanded for reconsideration of the weight given to Dr. Braco's report..

*(2)(c)   Incorrect Consideration of the Listings*

Emanuele contends that the ALJ "should have followed the guidelines set forth in the Blue Book 11.00 Neurological - Adult pertaining to multiple sclerosis." (Pl.'s Br. 8.) Although Emanuele does not explicitly label her argument as one aimed at the ALJ's step three determination, the court reads her brief liberally. *See Haines*, 404 U.S. at 520.

Although the ALJ wrote several paragraphs about listing 12.02, regarding organic mental disorders, and Emanuele's psychological testing with Dr. Elmudesi, his complete discussion of the listings regarding neurological disorders and multiple sclerosis is as follows: "The medical evidence in the file was not consistent with the claimant's multiple sclerosis meeting or equaling one of the neurological listings." (Tr. 20.) This one-sentence conclusion does not meet the minimally articulated standard for reasoning; the ALJ has failed to build a logical bridge between the evidence and his conclusion. As Emanuele points out, listing 11.00 applies to neurological conditions and listing 11.09 applies to multiple sclerosis specifically. However, the ALJ did not mention these listings

or the requirements set forth in them. Therefore, the case will be remanded for reconsideration of the neurological listings again at step three.[3]

*(2)(d)  Incorrect Consideration of Emanuele's Pain*

After quoting the portion of listing 11.00 that mentions "sensory disturbances," Emanuele writes that sensory disturbances include pain. She states that she documented her "pain numerous times in Exhibit 3 E Physical Activity Question[n]aire dated 8/8/04" and "testified on several occasions that the pain in her hands interfered with the use of her hands, fingers and fine motor skills." (Pl.'s Br. 7-8.)

Emanuele contends that the ALJ failed to fully develop the case record. It is unclear whether she means the record regarding the evoked response test, Dr. Braco's report, her pain in her hands, or listing 11.00. However, reading Emanuele's brief liberally, the court infers an argument that the ALJ did not discuss consideration of the pain in her hands as required. The court agrees.

An ALJ must consider a claimant's subjective complaints, if supported by medical signs and findings. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). But even if not substantiated by objective medical evidence, a claimant's testimony about the intensity or persistence of pain or other symptoms or their effect on her ability to work is not rejected. SSR 96-7p. "[S]ymptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). Whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective

---

[3]The court notes that the reconsideration of Dr. Khatri's opinions could impact the step three analysis as well. As noted above, the Appeals Council has said Exhibit 12F may support a finding that Emanuele meets section 11.09A of the listings. (Tr. 259.)

medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. SSR 96-7p. "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Scheck*, 357 F.3d at 703 (internal quotation marks omitted).

In evaluating credibility, the ALJ must comply with SSR 96-7p. *Brindisi*, 315 F.3d at 787. SSR 96-7p ruling requires consideration of (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures, other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms. Further,

> [i]t is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, *quoted in Brindisi*, 315 F.3d at 787.

A credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." SSR 96-7p. Further, "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's

testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (internal quotation marks omitted).

Here, the ALJ found that Emanuele's medically determinable impairments could reasonably be expected to produce her alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of her symptoms were not credible "prior to July 7, 2008." (Tr. 21.) Further, he found that her RFC after July 7, 2008, included "a mildly limited ability for fingering and other fine manipulation tasks" (Tr. 24), even though he did not find that limitation to exist prior to July 7, 2008.

The reasons the ALJ gave for discrediting Emanuele's reports of pain were that prior to July 7, 2008, her MS was shown to be improving or stable until she was diagnosed with a cognitive disorder, that she had refused to follow recommended treatment options that could have alleviated her symptoms, and that her subjective reports to doctors were sometimes not supported by clinical findings. (Tr. 21.) He also noted that Dr. Judith Carlson, who examined Emanuele in October 2007, stated that when Emanuele was questioned about her health care decisions "she became vague and could not really give any answers." (Tr. 23.) The ALJ pointed to Dr. Carlson's conclusion

> that some of the claimant's subjective reports were much more severe and intense than would be expected for a multiple sclerosis patient. He [sic] stated that her alleged symptoms were out of proportion to what would be expected, and it was highly unlikely that her multiple sclerosis would cause the exaggerated symptoms she was claiming. He [sic] noted that she was adamant in refusing medications that could help resolve her symptoms.

(Tr. 23.)

16

Although Dr. Carlson's report does support the ALJ's rejection of Emanuele's claims of pain and liminations, the ALJ failed to address adequately the significant evidence that was contrary to his conclusion, or at least not as strong as Dr. Carlson's report.  For instance, Dr. Michael Connor on July 7, 2008, stated that Emanuele's "hypesthesias and dysesthesias are possibly secondary to multiple sclerosis versus fibromyalgia versus idiopathic.  There is some suggestion of nonorganic nature to these symptoms as mentioned by Dr. Judith Carlson in her last evaluation." (Tr. 351.)  Thus, it appears Dr. Connor thought the relationship between MS and the burning sensation in Emanuele's hands was more possible than Dr. Carlson did.  Also, although the ALJ referenced records showing Emanuele's upper and lower body strength appeared normal, at times she could ambulate without difficulty, and she could feel her fingers and toes (Tr. 21-22), he did not much discuss Emanuele's reports of pain and the evidence that corroborated her reports.  That Emanuele had normal body strength and could feel her fingers and toes does not contradict her testimony as to the pain she felt and her inability to use her hands.

Emanuele testified at the November 2006 hearing that beginning in June 2004 she had "bad pain in my hands.  Like, they felt like they were raw, like somebody sanded off the skin. . . . But it went into my feet.  And then, I started dropping things, and my left hand started shaking uncontrollably."  (Tr. 423.)  She stated that she was still experiencing these same symptoms in November 2006, and that sometimes it was too painful for her to hold a book or a cigarette or to get her clothes out of the drawer.  (Tr. 424, 431, 433.)  Also, as of November 2006, Emanuele was sleeping or lying down resting a total of between twelve and twenty hours a day . (Tr. 429.)  She testified that she could sit

17

and concentrate for forty-five minutes before having to rest. (Tr. 435.) Emanuele said that on average, there are about three days per month during which she stayed in bed except to go to the bathroom. (Tr. 445.) She explained that she did not fill the prescription for the scooter because she could not afford the $2,500 deductible. (Tr. 430.)

In rejecting Emanuele's description of her pain and limitations, the ALJ pointed to the testimony of Emanuele's daughter, Stephanie: "During the claimant's November 15, 2006, hearing, the claimant's daughter testified that the claimant was able to work on the computer, take care of herself and help with the household chores. She stated that the only chore her mother did not help with was cooking." (Tr. 23.) But the ALJ's summation of Stephanie's testimony is quite a stretch. The actual testimony was as follows:

> A     She works on the computer a little bit. She doesn't really do much in the house. I usually will help–I usually do cleaning, me and my brothers. We do all the cleaning, the laundry. Sometimes, she'll do a little laundry. Outside, we do–she'll work around outside, but not very often.
>
> . . . .
>
> Q     And when you say, she does a little laundry, how often does she do laundry?
>
> A     Not even once a week.
>
> Q     And does anyone assist her doing the laundry?
>
> A     Yes, me and my brothers.
>
> Q     Does she do any cooking?
>
> A     No, not really.
>
> Q     Do you ever have to help her get dressed or, or, you know, doing hygiene, or anything like that?
>
> A     Sometimes. Well, I usually will get her clothes out for her, out of her drawers, and stuff like that. She doesn't usually need too much help getting dressed.
>
> Q     Do you ever help her wash her hair, or comb her hair, anything like that?
>
> A     Sometimes, I'll comb her hair, or put her shoes on or off for her . . . .

18

. . . .

    A       Maybe once a week, twice a week.

(Tr. 447-48.) According to Stephanie, her mother was generally awake a total of about four to five hours a day. (Tr. 448.)

Thus, Stephanie corroborated her mother's testimony regarding fatigue and needing help getting clothes out of drawers, stated that her mother did not help with cleaning or cooking and helped only minimally with laundry, and indicated Emanuele sometimes needed help combing her hair or putting on shoes. Yet, the ALJ did not acknowledge this corroboration or testimony, and his decision misstates it.

Emanuele next testified at the hearing on June 11, 2008. (Tr. 461.) She stated then that she was taking about two naps a day, at unpredictable times, for three to four hours each. (Tr. 472.) She testified that she still had pain in her hands: "raw, hypersensitive, like somebody sanded the skin off my hands and my feet." (Tr. 473.) In addition, Emanuele testified that the pain occurred every day and was aggravated by any activity and was worse if something touched her. (Tr. 473, 475.) She said she could sit for one hour at a time at most and that several times a week she would lie down to minimize pain, but the pain would not go away completely. (Tr. 474, 490.) Emanuele mentioned that although in 2004 she could still drive a car, she could no longer do that as of June 2008 because holding the steering wheel was too painful. (Tr. 478-79.) On an average day, her life was lived in her bedroom and about twenty feet away. (Tr. 496.)

In his decision, the ALJ stated that "[d]uring the claimant's October 28, 2008 hearing, the claimant's husband attended as a witness but did not testify." (Tr. 23.) Although that statement is technically true, it is misleading because Emanuele's husband,

Joseph, testified at the June 11, 2008, hearing rather than the October 2008 hearing.  (Tr. 508.)  Indeed, the ALJ never mentioned Joseph's testimony.

> Yet, Joseph testified his wife needed his help for
>
> cooking, cleaning, serving the food.  Sometimes, I've got to take her clothes off, her shoes off.  If we go, if, if we go walking around, which usually isn't that long, she has to hold onto me so she don't fall; and/or getting in the car, if she goes for a ride with me, which isn't very often, because she doesn't last that long, I have to put her seatbelt on her, and I've got to take it off her, because she just–using her hands hurts too much.

(Tr. 509.)  The ALJ also failed to address Joseph's statements in a third-party function report that Emanuele found even the handling of money to be painful and that numerous specified activities were affected by pain.  (Tr. 109, 111, 113.)

Medical evidence, too, supports Emanuele's claims of pain and fingering limitations.  In October 2004, Dr. Robert Braco stated his impression that Emanuele's "hand hyperesthesia[4] is likely to continue and fluctuate."  (Tr. 159.)  An RFC assessment of October 21, 2004, indicated that Emanuele had limitations with opposing fingers and thumbs. (Tr. 199.)  The ALJ did not discuss any of this evidence corroborating Emanuele's claims of pain in her hands or inability to use her fingers prior to July 7, 2008.

The ALJ rejected Emanuele's credibility because "[i]t was repeatedly noted that the claimant refused to follow her recommended treatment regimen that was expected to alleviate her symptoms."  (Tr. 21.)  Here, the ALJ was impermissibly making his own medical determination.  The record includes no evidence, such as a medical expert's opinion, on the best treatments for MS or the inadequacy of Emanuele's treatment.  At

---

[4]"Hyperesthesia" means "[a]bnormal acuteness of sensitivity to touch, pain , or other sensory stimuli."  Stedman's Medical Dictionary 920 (28th ed. 2006).

most it shows a disagreement between doctors regarding medications. Yes, several doctors, including neurologist Dr. Khatri, noted that Emanuele had rejected their suggested treatments and was instead taking a drug that was not specified for MS. But Emanuele *was* on a drug prescribed by a Dr. Jurik, naltrexone,[5] suggesting that in at least one provider's mind it was acceptable. (*See, e.g.*, Tr. 424, 494.) As Emanuele testified, it may not have been one of "the five known and most widely prescribed drugs for MS." (Tr. 425.) However, according to Emanuele, she did not take the drugs recommended by other doctors because she

> researched them, and it said that statistically, they help one-third of the people one-third of the time, and one of the side effects of MS drugs, and that's characteristic of all five drugs, is, suicidal depression is a possible side effect, and I don't want to deal with depression on top of having the disease.

(Tr. 426.) According to Emanuele, the naltrexone had helped her regarding her energy so that she could at least get out of bed. (Tr. 471.) Although the ALJ noted that Emanuele "was adamant in refusing medications that could help resolve her symptoms," he did not discuss the side effects of those medications or the actual medication Emanuele was taking. (*See also* Tr. 470 (Emanuele's description of possible side effects for interferon and immunotherapy injections).)

In sum, the ALJ did not adequately support his rejection of Emanuele's testimony regarding her pain and limitations or adequately discuss the evidence contrary to his RFC determination prior to July 7, 2008. Therefore, the case must be remanded.

---

[5]The drug is at times called naltrexone (Tr. 191), Neltrextrone (Tr. 424), and Naltroxen (Tr. 527).

21

*(3)    Consideration of Cognitive Disorder Regarding Credibility*
*(4)    Earlier Onset Date of Cognitive Disability*

Emanuele contends that nothing special occurred on July 7, 2008, to change her cognitive condition. She contends that although it was the date that Dr. Elmudesi first diagnosed a cognitive disorder, her condition had existed before that date.

The ALJ did not discuss the evidence that supports a finding of cognitive disorder prior to July 7, 2008. For instance, Emanuele's husband, Joseph, testified that he had noticed changes in her memory as early as May 2006. He said he had noticed that she would repeat questions, forgetting that she had asked the question earlier. (Tr. 510.) As noted above, the ALJ did not discuss Joseph's testimony.

Emanuele testified on October 28, 2008, that she had experienced forgetfulness for more than a year. (Tr. 531.)

On May 24, 2006, Dr. Khatri referred Emanuele for a neuro-psychiatric evaluation. (Tr. 227.) Emanuele testified that she did not have the evaluation because of the cost. (Tr. 546-67.) Regardless, the doctor's referral should have been discussed by the ALJ. Moreover, Dr. Khatri's records of May 10, 2006, noted that Emanuele and Joseph mentioned that Emanuele was suffering from reduced memory. (Tr. 227, 231.)

The ALJ wrote that when Dr. Carlson conducted his neurological consultation on October 1, 2007, he observed that "when the claimant was asked questions regarding her health care decisions, she became vague and could not really give any answers to the doctor's inquiries." (Tr. 23.) Dr. Carlson's report indicated that the vagueness occurred only in regard to naming the particular antibiotic she had stopped taking:

> Current medications include multivitamins and naltrexone as reported; she says that the physician in Illinois

> also gave her some type of antibiotic because M S was partially caused by infection, but she has just stopped taking them. She is very vague and cannot give me any names. There are no drug allergies.

(Tr. 329.)  The ALJ mentioned this evidence in support of his rejection of Emanuele's credibility.  That a patient cannot name the exact antibiotic she had been prescribed does not necessarily draw credibility into question.  But even if she was unreasonably vague, this evidence could be seen to *support* a finding of mental limitation.

Further, the ALJ used Emanuele's forgetfulness at the October 2008 hearing against her, stating that when questioned about the appointment with Dr. Carlson she

> was evasive and resistant to answering.  She claimed she could not remember working with Dr. Carlson or the content of their office visits. However, upon subsequent questioning, she displayed a much greater degree of recollection, and was able to answer questions in great detail.

(Tr. 23-24.)  The court's review of the transcript does not show support for this statement. There does not appear to be any subsequent questions regarding Emanuele's appointment with  Dr. Carlson after Emanuele testified that she could not recall that day.  (Tr. 524-75.) Moreover, she had answered questions about that appointment in detail at the June 2008 hearing, which the ALJ's decision failed to mention.  (Tr. 499-501.)  But again, Emanuele's inability to recall could be seen to *support* a finding of mental limitation.

Finally, the ALJ failed to address the testimony of Dr. Larrabee at the October 28, 2008 hearing.  Dr. Larrabee stated that the 2006 referral for a neurological examination combined with the results of Dr. Elmudesi's examination indicated a possibility or probability of a neuropsychological impairment that had not been diagnosed earlier.  (Tr. 562-64.)

23

The court agrees with Emanuele that the ALJ's decision must be remanded, as he failed to support with substantial evidence his rejection of mental limitations prior to July 7, 2008, and used evidence that supports her mental limitation (vagueness when answering a doctor's questions or inability to remember a day more than a year earlier) against Emanuele regarding credibility.

*(5)    Mischaracterization of Evidence and Combination of Errors by the ALJ*

Emanuele points to misstatements by the ALJ. The court agrees with her that the ALJ mischaracterized some evidence in the record in addition to the mischaracterized testimony of Stephanie, noted above.

First, the ALJ stated that in Dr. Elmudesi's report Emanuele "was noted to be able to care for herself, but needed some assistance in caring for her home," pointing to Exhibit 14F. (Tr. 20.) In Exhibit 14F, Dr. Elmudesi wrote that Emanuele reported that "her husband and kids perform most of the chores but that she supervises. Claimant stated that she can manage her own finances with assistance from her husband." (Tr. 339.) However, managing finances and supervising chores is not equivalent to caring for oneself with "some assistance."

Second, the ALJ wrote that "[o]verall, the claimant's multiple sclerosis was stable, until she experienced a deterioration of her health and was diagnosed with cognitive disorder on July 7, 2008, the established date of disability," citing Exhibits 1F, 3F, 4F, 5F, 13F, and 14F. (Tr. 21.) Yet the ALJ later wrote that MRI results in Exhibit 5F caused Dr. Khatri to observe a worsening of Emanuele's condition. (Tr. 23.) As Emanuele argues, the same Exhibit is being used to show stability and worsening. The ALJ needed to

discuss more which records showed stability and how, rather than referencing sixty-eight pages of records, some of which contradict a finding of stability.

At the end of her brief Emanuele states:  "Please see claimant's brief/letter to the Appeal's [sic] Council beginning on Record p 371 [sic] for a more complete list of errors in the decision."  (Pl.'s Br. 10.)  The court does not accept this attempt to incorporate a twenty-six page "response" to the ALJ's decision.  However, an additional error in the ALJ's decision is clear from a simple reading of the final decision issued November 24, 2008, as compared to the decision of December 19, 2006, and the transcripts of November 15, 2006, and October 28, 2006.  In his December 19, 2006, decision the ALJ found Emanuele's past relevant work to be as an assembler and supervisor and that Emanuele was not able to perform that past work.  (Tr. 255.)  At the November 15, 2006, hearing, Emanuele testified that she did not remember being a waitress within the past fifteen years, and the VE named only past work as an assembler and supervisor.  (Tr. 439, 451.)

In a work history report filed August 12, 2004, Emanuele said she had listed her work in order, with the most recent work first, and her work as a waitress was listed as job six.  (Tr. 92, 95.)  Yet at the October 28, 2008, hearing the VE identified waitressing as past relevant work.  (Tr. 570.)  And in the ALJ's final decision, he found that Emanuele *lost* at step four because prior to July 7, 2008, she was able to perform her past relevant work as a waitress.  (Tr. 25.)  The ALJ fails to cite any evidence in the record regarding use of waitressing as past relevant work.  It may be in the record, but this court should not have to scour the record to find it.  Because the ALJ has not cited to the evidence supporting a finding that waitressing is past relevant work, his decision is not sufficiently supported on this point as well.

CONCLUSION

For all of these reasons,

IT IS ORDERED that the Commissioner's decision is reversed and remanded under sentence four of 42 U.S.C. § 405(g).

Dated at Milwaukee, Wisconsin, this 17th day of March, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE